**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **J.P. MORGAN SECURITIES LLC,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **Plaintiff,** | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| **JOHN J. MULLARKEY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**
**(INJUNCTIVE RELIEF SOUGHT)**

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against defendant John J. Mullarkey ("Defendant").

**Preliminary Statement**

1.      This dispute arises out of Defendant's resignation from JPMorgan on May 28, 2021, and the immediate commencement of his affiliation with Morgan Stanley Smith Barny LLC ("Morgan Stanley").  At the time of his resignation, Defendant worked as a Private Client Advisor in a bank branch office of JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan, in Glen Ellyn, Illinois.

2.      JPMorgan has learned that since resigning from JPMorgan and joining Morgan Stanley, Defendant has solicited more than a dozen JPMorgan clients to move their accounts from JPMorgan to him at Morgan Stanley.  JPMorgan has learned that Defendant is calling JPMorgan clients, including calls to clients on their personal cell phones, seeking to induce such clients to transfer their accounts from JPMorgan to him at Morgan Stanley.  The clients have informed JPMorgan that Defendant's communications have been more than simply

announcing his change of employment, and that he is actively seeking to induce them to do business with him at Morgan Stanley.

3.      Specifically, numerous clients have informed JPMorgan that Defendant called them after he resigned from JPMorgan seeking to discuss transferring their accounts to him at Morgan Stanley.

4.      JPMorgan clients also have reported that Defendant's "pitch" includes touting his new firm in a further effort to induce clients to transfer their business to him at Morgan Stanley.  Specifically, Defendant is telling JPMorgan clients, among other things, that the clients would have more opportunities and new and different products at Morgan Stanley, Morgan Stanley has more resources and investing tools than JPMorgan, Morgan Stanley focuses more on investing than JPMorgan, and that he has more people working for him at Morgan Stanley to better service clients.  On information and belief, Defendant made these statements in a further effort to induce JPMorgan clients to transfer their accounts to him at Morgan Stanley.

5.      Some clients have reported that Defendant contacted them on several occasions and is making repeated and unwanted calls to them.  In one instance, a JPMorgan client informed the firm that, due to the repeated and unwanted calls by Defendant, he did not answer calls from a JPMorgan employee because he thought the calls were Defendant calling him again.  In another instance, a JPMorgan client indicated that Defendant called her three times alone over the Memorial Day weekend (right after his resignation), even though he almost never called her when he was employed at JPMorgan.

6.      In another instance, a client informed JPMorgan that Defendant called her and told her that she could come with Defendant to Morgan Stanley if she would like, even though the client did not raise the issue of transferring her accounts.

7.     In yet another instance, a client (a couple) informed JPMorgan that Defendant contacted them on the very same day he resigned from JPMorgan, and has contacted them on several additional occasions since that time.  The client indicated that it is clear that Defendant wants them to transfer their business relationship to him at Morgan Stanley, and even told the client that the fees at Morgan Stanley would be lower than they are at JPMorgan and that the client could transfer their assets to Morgan Stanley as is, without making any changes.

8.     Defendant's solicitations of JPMorgan clients is ongoing and continuing. One client just recently informed JPMorgan that Defendant continues to call him soliciting his business, telling him that Morgan Stanley's portfolios generate better investment returns than JPMorgan.  Another client informed JPMorgan that Defendant told the client that she should transfer assets to him at Morgan Stanley because he has or is in the process of moving 40% of his JPMorgan "book of business" to him at Morgan Stanley.

9.     More than a dozen JPMorgan clients have informed JPMorgan that Defendant has solicited their business and attempted to get them to transfer their accounts to him at Morgan Stanley.

10.     In addition, on information and belief, Defendant took with him to Morgan Stanley JPMorgan's confidential client information, including client contact information, such as cell phone numbers, which, on information and belief, are generally not publicly available, without which he would have been unable to immediately commence calling and soliciting JPMorgan clients as soon as he resigned from JPMorgan

11.     Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as approximately 13 JPMorgan households, with assets totaling more than $18 million, already have transferred their accounts to Defendant at Morgan Stanley.

3

12.     Defendant serviced approximately 290 JPMorgan clients/households with approximately $157 million in total assets under management, the substantial majority of which were either pre-existing JPMorgan clients at the time they were assigned to Defendant, or were developed by Defendant at JPMorgan.  In fact, at least 16 of the JPMorgan clients serviced by Defendant have been clients of JPMorgan or its predecessors for in excess of 40 years, and over 24 clients have been clients of JPMorgan or its predecessors for in excess of 30 years.

13.     Defendant's conduct constitutes a breach of his employment agreements (which contain non-solicitation and confidentiality provisions), JPMorgan's Code of Conduct, and a violation of his common-law obligations to JPMorgan.

14.     To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring him from further using JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against him in a related arbitration that JPMorgan is in the process of commencing.

**Jurisdiction and Venue**

15.     The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in DuPage County, Illinois.

## The Parties

17.     JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York.  The sole member of JPMorgan Securities is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of the Financial Industry Regulatory Authority ("FINRA").

18.     JPMorgan provides traditional banking, investment, and trust and estates services in the Chicago area through its Chase Wealth Management branch offices.  Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

19.     Defendant is an individual who at all times relevant herein was employed and/or conducted business in Illinois and was and is a citizen of Illinois.  Defendant worked for JPMorgan in an office in Glen Ellyn, Illinois, and is currently a registered representative associated with Morgan Stanley in its Oak Brook, Illinois office.  Defendant maintains securities licenses through FINRA.

20.     In connection his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration before FINRA disputes, claims and controversies arising between himself and JPMorgan.

## Factual Allegations

21.     Defendant has been employed by JPMorgan or its predecessors since 2009.  In or about July 2009, Defendant commenced employment with Chase Investment

Services Corp. ("Chase Investment"), then a registered broker-dealer, and an affiliate of JPMorgan, and entered into a Chase Private Client Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "2009 Non-Solicitation Agreement") with Chase Investment. The 2009 Non-Solicitation Agreement contains provisions prohibiting Defendant from soliciting JPMorgan's clients for a one period after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information. A true and accurate copy of the 2009 Non-Solicitation Agreement is annexed to the Declaration of Meghavi D. Rosean ("Rosean Declaration") as Exhibit A. Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

22. In 2013, Defendant entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement, dated May 21, 2013 (the "2013 Non-Solicitation Agreement") with JPMorgan. The 2013 Non-Solicitation Agreement also contains provisions prohibiting Defendant from soliciting JPMorgan's clients for a one-year period after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information. A true and accurate copy of the 2013 Non-Solicitation Agreement is annexed to the Rosean Declaration as Exhibit B.

23. From in or about October 2012 through his May 28, 2021 resignation, Defendant was a Private Client Advisor for Chase Wealth Management, working out of a JPMorgan Chase bank branch office in Glen Ellyn, Illinois. As a Private Client Advisor, JPMorgan Chase referred its bank clients to Defendant in order for him to build JPMorgan's relationship with such clients. Defendant sat at his desk at the JPMorgan Chase bank branch and

was introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management. As a Private Client Advisor, Defendant was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan. The substantial majority of the clients Defendant serviced at JPMorgan were assigned to him by JPMorgan or were referred to him by JPMorgan Chase.

24. On information and belief, Defendant had no prior industry experience before joining JPMorgan or its predecessors. In the "Attachment A" to the 2009 Non-Solicitation Agreement and the 2013 Non-Solicitation Agreement, Defendant was permitted to identify all client relationships that he had established prior to commencing employment with JPMorgan, and those pre-existing relationships would be carved out from the non-solicitation restriction in the agreement. Defendant's Attachments A to the 2009 Non-Solicitation Agreement and the 2013 Non-Solicitation Agreement are blank.

25. As indicated above, at the time he left JPMorgan, Defendant serviced approximately 290 JPMorgan clients/households, the substantial majority of which were either pre-existing JPMorgan clients at the time they were assigned to Defendant, or were developed by Defendant at JPMorgan. The clients serviced by Defendant at JPMorgan had a total of approximately $157 million in total assets under management. Defendant now seeks to improperly induce such JPMorgan clients to follow him to Morgan Stanley.

26. In consideration for entering into and continuing their employment relationship with JPMorgan and executing the Non-Solicitation Agreements, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

## Defendant's Obligations to JPMorgan

27.     As noted above, Defendant entered into multiple agreements with JPMorgan or its predecessors that, among other things, contain provisions prohibiting him from soliciting JPMorgan clients for a period of one year after his JPMorgan employment ends and from using or retaining JPMorgan confidential information.

28.     Section 7(a) of the 2013 Non-Solicitation Agreement, entitled "Confidential Information," provides, in relevant part, that:

> You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.

29.     Section 7(b) of the 2013 Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> i.  names, addresses and telephone numbers of customers and prospective customers;
>
> ii.  account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;
>
> iii.  specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;

> \*       \*       \*

> vi. *all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*
>
> \*     \*     \*
>
> viii. *information concerning established business relationships;*
>
> ix. *"trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section.*

30.     In Section 7(c) of the 2013 Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

31.     In Sections 7(d) and 7(e) of the 2013 Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of his employment.

32.     In Section 8 of the 2013 Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

> a.  *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein, **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment***

9

*with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.*

b. *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including without limitation the Chase Wealth Management and the Chase Private Client platforms. Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with JPMS and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A. Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC. The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC. This platform and relationship model developed by JPMC is special and unique to JPMC, providing you and JPMC with a unique opportunity to service and interact with clients and customers in ways not known or available to competitors. You acknowledge that by utilizing the platforms, you will be given access to confidential information and/or trade secrets, which are not readily available through any public sources and the protection of which represent a legitimate business interest of JPMC.*

c. *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.*

33.     As noted above, Defendant had no prior industry experience before joining JPMorgan or its predecessors. In the "Attachment A" to the 2009 Non-Solicitation Agreement and the 2013 Non-Solicitation Agreement, Defendant was permitted to identify all client relationships that he had established prior to commencing employment with JPMorgan, and those pre-existing relationships would be carved out from the non-solicitation restriction in the agreement. Defendant's Attachments A to the 2009 Non-Solicitation Agreement and the

2013 Non-Solicitation Agreement are blank and he listed no such pre-existing client relationships.

34.     In Section 10(a) of the 2013 Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with counsel:

> i.   *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement.  You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*

> ii.  *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*

> iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving compensation associated with non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions.  You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

35.     In addition, in Section 10(b) of the 2013 Non-Solicitation Agreement, Defendant acknowledges that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys'

fees in connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreement.

36.     The 2009 Non-Solicitation Agreement contains provisions substantially similar as to those in the 2013 Non-Solicitation Agreement.

37.     Additionally, in Section 3(b) of the 2013 Non-Solicitation Agreement and 2009 Non-Solicitation Agreement, Defendant agreed to adhere to JPMorgan's Code of Conduct, as amended from time to time.

38.     Defendant had access to and is bound by JPMorgan's Code of Conduct, which was made available to all employees, as it was updated from time to time.  Section 3.6 of JPMorgan's Code of Conduct, entitled "Leaving JPMorgan Chase," provides, in relevant part:

> *As a condition of working for [JPMorgan], there are certain responsibilities you will have as you leave our Company and as your employment with our Company ends, including:*
>
> - *Providing advance notice of resignation*
>
> - *Returning all Company assets in your possession*
>
> - *Maintaining the confidentiality of information, not only of [JPMorgan] but of those individuals and companies that do business with [JPMorgan]; this does not prevent you from reporting to the government or regulators, your attorney or a court under seal, concerns of conduct that you believe to be in violation of law, or retaliation for reporting a concern*
>
> - *Refraining from buying or selling securities while in possession of MNPI relating to those securities (insider trading)*
>
> - *Assisting with any investigations, litigation and the protection of intellectual property related to your job.*
>
> *Certain senior employees have additional obligations for one year after they leave [JPMorgan] including prohibitions in soliciting and hiring JPMorgan Chase employees or soliciting certain customers. Some employees are subject to other post-employment restrictions. You have a responsibility to known and comply with the requirements*

> *that apply to you.  Consult with your Human Resources Business Partner if you have any questions.*

39.     A true and correct copy of relevant sections of JPMorgan's Code of Conduct, including Section 3.6, and the related policy link entitled "Responsibilities of Former Employees," is attached to the Rosean Declaration as <u>Exhibits C and D</u>, respectively.

40.     As set forth in Section 1.2 of JPMorgan's Code of Conduct, all JPMorgan employees are required to affirm, either in writing or electronically, that they have read and understood the Code and that they will comply with it.  Section 1.2 provides, in relevant part:

> *Each of us has a responsibility to uphold the Code; in fact, compliance with the Code is a term and condition of employment with the Company.  This means you must know the Code, you must do the right thing when it comes to your own conduct, and you must speak up about conduct by others that might violate our Code or Company policies . . .*
>
> *Prior to joining the Company, new hires are required to provide an affirmation that they have read and understand the Code, will comply with it and will report suspected violations as required by the Code. New hires must complete Code training shortly after they begin work. All employees are required to complete additional Code training and provide a new affirmation periodically, usually annually. Compliance with these requirements is a condition of employment.*

41.     JPMorgan requires employees to annually affirm electronically their agreement to comply with the Code of Conduct.  A true and correct copy of Defendant's affirmation to adhere to the Code of Conduct for the most recent acknowledgment cycle is annexed to the Rosean Declaration as <u>Exhibit E</u>.

42.     JPMorgan's "Responsibilities of Former Employees" policy also provides in Section 5.1, in relevant part:

> *When you leave JPMorgan Chase, you are not permitted to use any Company assets or access its systems.  You may only access its buildings in visitor status.  You must also turn over to the Company, in good condition, all assets of the Company that are in your*

*possession or control (or come into your possession or control in the future), including but, not limited to:*

            \*                \*                 \*

- *all Confidential Information, whether maintained electronically or otherwise, including information on mobile or remote computers, such as desktop PCs, laptops, personal digital assistants, pagers, cell phones and all other wireless devices, whether you own the devices or the devices belong to the Company and are used at locations other than a JPMorgan Chase place of business.*

*You are not permitted to duplicate or remove from JPMorgan Chase's premises, or directly or indirectly access, use or disclose to anyone, any Confidential Information. (For a description and additional examples of Confidential Information, refer to section 7 of this Policy and section 1.4 – Dealing with Confidential Information in the Company's Code of Conduct)*

## JPMorgan's Relationship with its Clients and its Confidential Information

43.     As indicated above, JPMorgan gave Defendant the substantial majority of the clients he was servicing at the time of his resignations. The significant majority of clients assigned to Defendant were pre-existing JPMorgan clients who were reassigned to Defendant, were long-term Chase Bank clients who were referred to Defendant, or were developed by JPMorgan at the time they were assigned to Defendant. In fact, as noted above, at least 16 of the JPMorgan clients serviced by Defendant have been clients of JPMorgan or its predecessors for in excess of 40 years, and over 24 clients have been clients of JPMorgan or its predecessors for in excess of 30 years. Thus, JPMorgan has a near-permanent relationship with the vast majority of the clients that JPMorgan assigned to Defendant and whom he is now soliciting.

44.     JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years. It is with great difficulty, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients. JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information. It typically takes many years of dealing

with clients for JPMorgan to become their primary investing firm. JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan. But for Defendant's employment with JPMorgan, Defendant would not have had any contact with the substantial majority of the clients the firm assigned to them and whom he is now soliciting.

45.     As part of his official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estates needs. As explained in further detail below, such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor such as Morgan Stanley.

46.     During the course of his employment by JPMorgan, Defendant had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan. JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data. Defendant had no interaction with the substantial majority of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan. As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

47.     A critical factor to JPMorgan's continued success is its relations with its clients. JPMorgan has built the loyalty of its client base through many years of effort and has

invested substantially in building JPMorgan's goodwill. JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

48.     JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients. JPMorgan has invested substantial corporate resources to develop and maintain its client information. The substantial majority of the JPMorgan clients that Defendant serviced were developed by JPMorgan at great expense and over a number of years. JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

49.     JPMorgan also has expended significant resources to service its clients, the substantial majority of whom were assigned to Defendant or referred to him by JPMorgan Chase. These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

50.     JPMorgan employs reasonable efforts to maintain the confidentiality of its client records.  Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records. Employees such as Defendant must maintain client information as strictly confidential.  These instructions are confirmed in the agreements and policy manual provisions referenced above.

51.     The confidential information that Defendant, on information and belief, has taken or retained was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third parties.  Indeed, by law JPMorgan must safeguard this information until such time as the controlling authorities authorize its release. Defendant had access to this information solely by virtue of his employment by JPMorgan. JPMorgan and Defendant are obliged to maintain the confidentiality of this information.  For its part, JPMorgan took numerous steps to protect the confidentiality of this information.  Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies regarding confidentiality.  JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information.  For example, access to the JPMorgan's computer network by its professionals is password-protected.  JPMorgan also limits its client information to certain employees and management who need access to such information.

### Defendant's Misconduct

52.     As noted above and incorporated herein, Defendant abruptly resigned from JPMorgan on May 28, 2021, immediately joined Morgan Stanley, and began soliciting JPMorgan clients.

53.     As set forth above, more than a dozen JPMorgan clients have informed JPMorgan that Defendant has solicited their business and attempted to get them to transfer their accounts to him at Morgan Stanley, as detailed above.

54.     Defendant's solicitation of JPMorgan clients is ongoing and continuing.

55.     On information and belief, without misappropriating JPMorgan's confidential client information, Defendant would not have had clients' personal phone numbers, and would not have had the ability to call JPMorgan clients immediately after he resigned.

56.     Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, misappropriation of trade secrets, tortious interference, conversion, and unfair competition.  Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct.  This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

57.     By seeking to improperly solicit JPMorgan's clients, Defendant has and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages.  Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

(a)     Loss of JPMorgan clients and loss of client confidence;

(b)     Injury to JPMorgan's reputation and goodwill in Illinois;

(c)     Use and disclosure of JPMorgan's trade secrets and confidential and proprietary information, including client lists;

(d)     Damage to office morale and stability, and the undermining of office protocols and procedures; and

(e)     Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

58.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 57 hereof.

59.     Defendant breached his contracts and agreements with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking JPMorgan's confidential client information.  By engaging in such conduct, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

60.     As a direct and proximate result of Defendant's breach of his contracts, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

61.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 60 hereof.

62.     JPMorgan's confidential and proprietary business and client information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.  JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information,

including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements. Accordingly, JPMorgan's confidential and proprietary business and customer information constitutes trade secrets pursuant to statutory and common law.

63.     As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**THIRD CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

64.     JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 63 hereof.

65.     As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and loyalty.

66.     Defendant's fiduciary duty required him at all times to, among other things, act in JPMorgan's best interests and not act on behalf of competing third parties, and maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information. Defendant's fiduciary duty required him at all times to refrain from, among other things, soliciting JPMorgan's clients to join him at a competing company.

67.     Defendant breached his fiduciary duty to JPMorgan by engaging in the conduct alleged above. Defendant engaged in such wrongdoing upon his resignation from JPMorgan and joining JPMorgan's competitor, Morgan Stanley.

68.     As a direct and proximate result of Defendant's breaches of his fiduciary duty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from

which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FOURTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

69.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 68 hereof.

70.     By virtue of his position with JPMorgan, Defendant owed JPMorgan a duty of undivided loyalty during the term of his employment with JPMorgan. Defendant's duty of loyalty prohibited him from competing with JPMorgan or assisting a competing business during the course of his employment with JPMorgan. Defendant's duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

71.     Defendant breached his duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of his employment with JPMorgan.

72.     Defendant knew and intended, or knew and recklessly or negligently disregarded, that his acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

73.     As a direct and proximate result of Defendant's breach of his duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FIFTH CAUSE OF ACTION
### (Intentional Interference with Actual
and Prospective Economic Advantages)

74. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 73 hereof.

75. JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

76. JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

77. JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally, maliciously and improperly interfered with and continue to interfere with JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with his new employer.

78. There was no privilege or justification for Defendant's conduct. Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including breach of contract, unfair competition, and breach of his fiduciary duty.

79. Defendant's conduct was willful and malicious.

80. As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to

sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SIXTH CAUSE OF ACTION
### (Negligent Interference with Actual and Prospective Economic Advantages)

81.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 80 hereof.

82.     JPMorgan entrusted Defendant with confidential information for use solely in performing his duties as an employee of JPMorgan. As an employee of JPMorgan, Defendant occupied a position of great trust and confidence. Defendant thereby owed JPMorgan a fiduciary duty to deal with JPMorgan in good faith and with loyalty. Defendant also was obligated to use due care so as not to interfere with JPMorgan's business relationships, including those with its clients.

83.     Defendant, in breach of his duty of due care, has attempted to induce JPMorgan clients to leave JPMorgan.

84.     JPMorgan is informed and believes, and on that basis alleges, that Defendant was fully aware that his failure to use ordinary care would cause JPMorgan to lose clients.

85.     As a direct and proximate result of Defendant's negligent interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SEVENTH CAUSE OF ACTION
### (Conversion)

86.     JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 85 hereof.

87.     At all times JPMorgan was, and still is, entitled to the immediate and exclusive possession of its trade secrets and other proprietary information, and all physical embodiments thereof, as alleged above.

88.     JPMorgan is informed and believes that Defendant took JPMorgan's trade secret and other proprietary information, including but not limited confidential client information, and converted such information for the use of Defendant and those acting in concert with him.

89.     The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

90.     As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## EIGHTH CAUSE OF ACTION
### (Unfair Competition)

91.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 90 hereof.

92.     Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

93.     As a direct and proximate result of the Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**WHEREFORE**, Plaintiff respectfully requests that a judgment be entered in its favor against Defendant as follows:

A.     In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award on JPMorgan's claim for permanent injunctive relief, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of Morgan Stanley, from:

> (a)     soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose name became known to Defendant by virtue of his employment with JPMorgan (or any of its predecessors in interest); and

> (b)     using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.     Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C.     Such other and further relief as the Court deems just and proper.

Dated: July 13, 2021

Respectfully submitted,

**J.P. MORGAN SECURITIES LLC**


By:  */s/ Alan King*
　　　　　*One of its attorneys*


Matthew C. Crowl (ARDC No. 6201018)
*mcrowl@rshc-law.com*
Alan King (ARDC No. 6198223)
*aking@rshc-law.com*
Riley Safer Holmes & Cancila LLP
70 W. Madison Street
Suite 2900
Chicago, Illinois 60602
(312) 471-8700

Leonard Weintraub *(application for admission
pro hac vice forthcoming)*
*lw@pwlawyers.com*
Paduano & Weintraub LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100